Walgreen, Inc., v. Commissioner.
Walgreen, Inc. v. Commissioner
Docket No. 12360.
United States Tax Court
1948 Tax Ct. Memo LEXIS 227; 7 T.C.M. (CCH) 166; T.C.M. (RIA) 48042; March 30, 1948
*227 Petitioner, a Texas corporation, had been hopelessly insolvent for several years prior to 1939. In the period from 1926 to 1930 loans had been made to petitioner by another corporation in the amount of about $65,000 evidenced by petitioner's note. After 1930 petitioner made payments on the principal of the debt in the amount of approximately $10,000, which the payee of the note reported as bad debt recoveries. On July 31, 1939, petitioner's then sole stockholder, a trust association, had an opportunity to sell petitioner's stock for $500 to another corporation, which wished to obtain a charter to operate in Texas. Petitioner then had a surplus deficit of approximately $78,000. On that date entries were made on the books of the petitioner transferring the indebtedness from its notes payable account to the account of its sole stockholder, and the latter account was closed out to surplus, thus reducing the deficit on petitioner's books to an amount equal to its capital stock account. No transfer or assignment of the debt or of the note evidencing it from the original creditor to the petitioner's sole stockholder was shown. Held, no amount may be included in petitioner's equity invested *228 capital under section 718, I.R.C., on account of the claimed cancellation of indebtedness. Jackson L. Boughner, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This case involves an excess profits tax deficiency for the fiscal year ended September 30, 1942, in the amount of $4,013.42. The issue concerns equity invested capital, the petitioner contending that it should include an item of some $54,000 as a contribution to capital. The case was submitted altogether upon a stipulation of facts, which we adopt and incorporate herein by reference. Findings of Fact Petitioner is a Texas corporation organized in 1925. Its name at that time was "United States Drug Store" but the name was changed to "Walgreen, Inc.," in 1939, shortly after its outstanding stock was sold to Walgreen Company (Illinois) on July 31, 1939. Petitioner's principal office in the taxable year was in Chicago, Illinois, and its tax returns for that year were filed with the collector of internal revenue for the first district of Illinois. H. Kempner was a trust association formed January 1, 1920, to take over the operation of various property *229 and business interests which had been operated as a unit by the heirs of Mr. H. Kempner since his death in 1894. Each of the nine heirs received a 1/9 interest in the trust association. The interests so acquired by the association included interests in banking, cotton, insurance companies, warehouses, real estate, and sugar, most of which were located in Texas. Net assets held by the trust association on December 31, 1925, aggregated more than $5,000,000. The management of H. Kempner was under the direction of five trustees, two of whom were R. Lee Kempner and D. W. Kempner, sons of Mr. H. Kempner, deceased. The trust association, H. Kempner, filed income tax returns as a corporation. H. Kempner Investment Association (hereinafter called Investment Association) was incorporated in 1926. All of its stock was held by nominees for H. Kempner, and from 1926 through 1933 it filed consolidated income tax returns with H. Kempner. United States National Building Company (hereinafter called U.S. National) was organized in October 1923 primarily to acquire a site and construct an office building in Galveston, Texas, in which the United States National Bank would be located. U.S. National *230 had an authorized capital stock of $20,000. Shortly after the building was completed it was acquired by the bank, subject to a mortgage of $500,000. U.S. National continued in business, making other investments; and ever since the completion of the building it has acted as managing agent without charge, executing leases, collecting rents, and handling the maintenance of the building. R. Lee Kempner was the active head of the bank. During all times here material H. Kempner held a substantial interest in the bank. Since the end of 1930 the entire outstanding stock of U.S. National has been held by nominees for H. Kempner, and U.S. National filed consolidated returns with H. Kempner for 1931, 1932, and 1933. The petitioner was organized October 5, 1925, for the purpose of operating a drug store and in order to provide a tenant for a portion of the United States National Bank Building. From December 31, 1934, to July 31, 1939, petitioner's entire outstanding stock, 200 shares of $100 par value each, was held by nominees for H. Kempner. From its organization in October 1925 to June 1934, petitioner's drug store was operated by a series of managers. The first manager, an individual, *231 had an option to purchase the petitioner's stock. This option was embodied in a letter dated September 23, 1925, before the petitioner's organization. It was written on a letterhead of H. Kempner, addressed to the prospective manager, and signed by D. W. Kempner. D. W. Kempner, on behalf of the stockholders of petitioner, proposed to employ the addressee as manager and to give him an option to purchase petitioner's stock. The first manager served through 1929 but did not exercise the option. The second manager, a corporation, had an option from the petitioner to purchase its business but did not exercise the option. The third manager, an individual, who took over in 1933, purported to buy from H. Kempner 100 shares of petitioner's stock which H. Kempner had acquired from the Investment Association in November 1930; but he did not pay for the stock, and it was repossessed by H. Kempner in 1934. From June 1934 to January 1938, Walgreen Texas Company operated the drug store on a rental basis from the petitioner. The petitioner's operations were unsuccessful and it sustained annual operating losses. Its operating deficit on December 31, 1930, was $65,894.55. The surplus deficit had increased *232 to $78,188.01 by December 31, 1938. From May 5, 1926, to February 17, 1927, H. Kempner advanced $40,000 to U.S. National, which U.S. National in turn advanced to petitioner. From December 6, 1927, to January 9, 1930, H. Kempner advanced $35,000 to the Investment Association, which was in turn advanced to U.S. National and in turn advanced to petitioner. At the time of each advance, except the last on January 9, 1930, in the amount of $6,500, petitioner executed a note, payable to its own order, in the amount of the advance, with interest at 6 per cent per annum, and then endorsed the note in blank. Interest on the advances was paid by petitioner to U.S. National prior to 1930. Against the total of $75,000 advances, petitioner received a credit of $10,000 for the issuance of 100 shares of its capital stock on January 24, 1927, in partial repayment. These were the same shares, mentioned above, which H. Kempner acquired from the Investment Association in November 1930. On November 14, 1930, the advances to petitioner were represented by one promissory note for $65,000, payable on demand to U.S. National, with interest at 6 per cent per annum. On November 14, 1930, U.S. National charged *233 the $65,000 balance due from the petitioner to an account on its books entitled "R. Lee Kempner". The exact nature of this account is not disclosed. At some time prior to December 1925 the account title included the word "trustee", but that word was thereafter erased. After November 14, 1930, neither U.S. National nor H. Kempner carried the $65,000 balance on its books either as notes receivable, or as an investment in petitioner, or in any other account. On its books petitioner carried the $65,000 liability in its "Notes Payable" account. After November 14, 1930, but before July 31, 1939, petitioner paid U.S. National $10,031.94, reducing the $65,000 liability on petitioner's books to $54,968.06. U.S. National in its income tax returns reported the $10,031.94 as bad debt recoveries and credited them to profit and loss on its books. From November 20, 1930, to June 30, 1934, H. Kempner had an account on its books entitled "U.S. Drug Store Investment Account"; and after March 21, 1931, petitioner had a reciprocal account on its books entitled "H. Kempner". In its "U.S. Drug Store Investment Account" H. Kempner carried, among other debit entries, the 100 shares of petitioner's stock *234 acquired from the Investment Association from November 20, 1930, until it sold the stock on June 30, 1933, to the third manager who operated petitioner's drug store. In 1933 and 1934 petitioner paid rentals to H. Kempner, which petitioner charged to expense on its books but which H. Kempner credited to the "U.S. Drug Store Investment Account" on its books. The latter account was closed with no balance on H. Kempner's books after a payment of $781.77 by petitioner on June 29, 1934; but on July 29, 1939, the "H. Kempner" account on petitioner's books showed a balance due of $5,718.23. On July 24, 1939, there were special meetings of petitioner's stockholders and board of directors, at which it was voted to authorize a sale of all the petitioner's assets to "H. Kempner at book value in satisfaction of the obligation owed by the corporation to H. Kempner". On July 31, 1939, petitioner debited to its account, "H. Kempner"., the amount of $2,486.28, which represented cash of $225.45 and furniture and fixtures of a net book value of $2,260.83, transferred to H. Kempner in accordance with the resolutions of petitioner's stockholders and directors. The furniture and fixtures so transferred *235 had a fair market value not in excess of the depreciated book value. On July 31, 1939, petitioner credited to its account entitled "H. Kempner" the balance of $54,968.06 in its "Notes Payable" account. It then closed out the balance in the "H. Kempner" account with a credit to its "Profit and Loss" account (representing its surplus account) in the amount of $58,200.01. This reduced the surplus deficit to $20,000, which, when offset against the $20,000 capital stock account, resulted in a net worth of zero. However, no formal and specific assignment or transfer in writing of the $65,000 note was executed from R. Lee Kempner or U.S. National to H. Kempner. There was no account on the books of H. Kempner which showed the $65,000 note (or the $54,968.06 balance due thereon according to the petitioner's books) as an investment in or a debt due from the petitioner. On July 31, 1939, petitioner's outstanding stock was sold for $500 and transferred from nominees for H. Kempner to nominees for Walgreen Company (Illinois). In connection with the transfer, D. W. Kempner, who was then the petitioner's president, one of the trustees for H. Kempner, and a nominee for H. Kempner, executed an *236 affidavit to the effect that there were no debts or obligations owing by or existing against the petitinoer or any of its stock. Walgreen Company (Illinois), the parent corporation, acquired the petitioner's capital stock because, for reasons here immaterial, it wanted to acquire the stock of a domestic Texas corporation which could operate drug stores in Texas. After July 31, 1939, neither H. Kempner nor any of its affiliates or trustees had any interest in the petitioner. H. Kempner credited to its "Profit and Loss" account the $500 received upon the sale of petitioner's stock and the net amount, $2,486.28, of the furniture, fixtures, and cash received from the petitioner. In its 1939 income tax return H. Kempner included this amount in income as a bad debt recovery For all periods here material, the cash receipts and disbursements method was used by H. Kempner, U.S. National, and the petitioner. The books and records of H. Kempner, U.S. National, the Investment Association, and the petitioner were all kept in the same office in the bank building and were all handled by the same general staff. The accounts of petitioner and U.S. National prior to June 1929 were kept by a person *237 who is now deceased. On its excess profits tax return for the taxable year involved petitioner included in equity invested capital as "money paid in for stock or as paid in surplus, or as a contribution of capital" the amount of $83,200.01, which was a total of the following items: Capital Stock
$20,000.00
Cash donated by Walgreen Co. (Ill.)
5,000.00
Cancellation of indebtedness
58,200.01
Total
$83,200.01
In the deficiency notice the Commissioner held that the item of $58,200.01, entitled "Cancellation of Indebtedness", was not properly includible in equity invested capital. Opinion ARUNDELL, Judge: Petitioner now makes two contentions in respect to what its equity invested capital should include as money previously paid in as a contribution to capital under section 718(a) (1)of the Internal Revenue Code. Pertinent sections of the statute are set out in the margin. * The main contention is that invested capital should include $54,968.06, as representing an indebtedness of the petitioner which was cancelled by its sole stockholder on July 31, 1939. The alternative contention is that it should include at least $40,000, as the aggregate *238 of payments (loans) made after January 24, 1927, to petitioner by a stockholder during a period when petitioner was insolvent both before and after each payment. *239 The immediate difficulty with petitioner's contentions is that they proceed upon assumptions which we think are unwarranted by the record. The main contention assumes that H. Kempner, as the sole stockholder of petitioner on July 31, 1939, cancelled an indebtedness of $54,968.06 owing from petitioner to H. Kempner. It has not been sufficiently demonstrated, however, that the obligation on the $65,000 note was transferred to or acquired by H. Kempner. On November 14, 1930, the original obligee, U.S. National, charged off the note on its books to its account entitled "R. Lee Kempner". This could indicate a transfer of the obligation from U.S. National to R. Lee Kempner. The note inself, however, contains no indication that it was ever transferred to him, or to anyone else for that matter. Furthermore, it is stipulated that neither R. Lee Kempner nor U.S. National executed a formal and specific assignment or transfer in writing of the note to H. Kempner. Payments made on the note by petitioner to U.S. National after November 14, 1930, were apparently not turned over by U.S. National to anyone else as a transferee of the note. They were, in fact, credited by U.S. National to its surplus *240 account and reported in its tax returns as bad debt recoveries. H. Kempner did not take up the note or obligation on its books either as an investment in, or a debt due from, the petitioner. Only on the petitioner's books were there any entries which would tend to indicate a transfer of the obligation to H. Kempner. These were the entries made on July 31, 1939 - the day all of petitioner's outstanding stock was sold to Walgreen Company (Illinois) - which transferred the balance in petitioner's "Notes Payable" account to its "H. Kempner" account. Further entries were made on the same day closing out the balance in the "H. Kempner" account to the "Profit and Loss" account. These entries on the books of petitioner, together with D. W. Kempner's affidavit of July 31, 1939, are relied upon, first, to show that the indebtedness was then due to H. Kempner and, second, that H. Kempner thereupon cancelled the indebtedness, thereby making a contribution to petitioner's capital. The $65,000 note itself does not bear any notation indicating either assignment or cancellation. We think the evidence is insufficient to establish the petitioner's fundamental factual premises. Petitioner further *241 suggests that even if H. Kempner was not the owner of the note on July 31, 1939, the result would be the same if H. Kempner, as the owner of all the stock of U.S. National, caused U.S. National to cancel the note. Here, again, the factual difficulty is that it has not been sufficiently established that U.S. National, at that time, was the owner of the note. On the basis of the stipulation, it could be argued with equal support that R. Lee Kempner was then the creditor. There are yet further obstacles in petitioner's path. It may well be that under certain circumstances the cancellation of an indebtedness by a stockholder can amount to a contribution to capital, so as to increase statutory invested capital for excess profits tax purposes. The Parisian, 2 B.T.A. 415; Cohn-Goodman Co., 7 B.T.A. 475; see Liberty Mirror Works, 3 T.C. 1018. For example where the corporate debtor is suffiicently able to pay and the stockholder-creditor forgives the debt with the intention of increasing his investment in the enterprise, the net result may be the same as if the corporation pays its debt and the stockholder then pays the money back in as a contribution *242 to capital. But where the corporation is hopelessly insolvent and, there is no possibility of the stockholder-creditor's obtaining payment, it is difficult to see how the purported cancellation of the debt is the equivalent of paying in money as a contribution to capital. Here the petitioner was clearly insolvent long prior to 1939. In these circumstances, even if the record be taken as establishing that H. Kempner was the creditor on July 31, 1939, we think there would be no merit in the claim that cancellation of the indebtedness resulted in money paid in as a contribution to capital. If H. Kempner was then the creditor, it could have been so only because it had acquired the obligation from another, since it was not the original creditor of the petitioner on the $65,000 loans. There is no showing as to what it cost H. Kempner to acquire the obligation, if in fact H. Kempner did acquire it. We cannot assume that the loans which H. Kempner made to U.S. National and to the Investment Association in the years 1926 to 1930 were not repaid to it, or that those debts were satisfied by the transfer of the petitioner's obligation. It is inconceivable that H. Kempner, in July 1939, and in *243 order to place itself in a position to sell petitioner's stock for a mere $500, would have paid out $54,968.06 cash, either to buy off the petitioner's creditor or to enable petitioner to pay the creditor. We think it idle, therefore, to argue that the alleged cancellation of indebtedness was the equivalent of H. Kempner's paying in $54,968.06 cash to the petitioner as a contribution to capital. While petitioner does not claim that the alleged forgiveness gave rise to property paid in as a contribution to capital under section 718 (a) (2), it may be pointed out that no allowance for invested capital under that section could be made here. See Doylestown & Easton Motor Coach Co., 9 T.C. 846. As a practical matter, at the time the petitioner's stock was sold to the Walgreen interests, the petitioner was little more than a shell. The small amount of its assets (cash, furniture, and fixtures) had been transferred to H. Kempner. Petitioner was left without assets, so that a forgiveness of indebtedness could not have had the effect of freeing assets in petitioner's hands. The actions of H. Kempner do not suggest that it treated the transaction as a contribution to the petitioner's *244 capital so as to increase its investment in the petitioner. It did not add $54,968.06 to its basis on the stock and claim a loss measured by the difference between the basis and the $500 sale proceeds. On the contrary, it reported the $500 as income and credited it to profit and loss on its books. Petitioner's alternative contention that at least $40,000 should be included in invested capital, on the theory that that amount represents the aggregate of money paid in by a stockholder at times (1927, 1928, and 1929) when petitioner was insolvent both before and after each such payment (loan), is likewise predicated upon assumptions which in our opinion are not supported by the weight of the evidence. The first such assumption is that H. Kempner was a stockholder of the petitioner in those years. The second is that H. Kempner made the payments or loans to petitioner. The third is that U.S. National was a wholly owned subsidiary of H. Kempner during that period. While it is stipulated that after December 31, 1934, all the petitioner's stock was held by nominees for H. Kempner and that since the end of 1930 the stock of U.S. National was held by nominees for H. Kempner, the record does *245 not clearly disclose the ownership of the stock of these two corporations in the period prior to 1930. It is unnecessary to set out all the stipulated evidence with respect to the ownership of petitioner's and U.S. National's stock during that earlier period. In large part it consists of stipulated entries in various accounts on the books of the several corporations, often without any indication as to the nature of the account or explanation of what the entries mean. It includes conflicting statements made in various tax returns of the several corporations with reference to the ownership of petitioner's and U.S. National's stock. The stock certificates were in the names of individuals, some of whom had no financial interest in H. Kempner. In the case of U.S. National, it is stipulated that the available records do not reveal the actual source of the original payment for its stock. The so-called payments in question were actually loans, so treated by the parties. Furthermore, H. Kempner was not the one who made the loans to the petitioner. The stipulation is that in some instances H. Kempner advanced money to U.S. National, which U.S. National in turn advanced to petitioner; in other *246 instances, that H. Kempner advanced money to the Investment Association, which was in turn advanced to U.S. National and by it in turn advanced to petitioner. U.S. National, not H. Kempner, was the petitioner's creditor on these loans when they were made. At the hearing in this case, it was brought out by the opening statements of counsel that while the parties had purported to stipulate the facts, there were certain basic facts as to which they could not agree. The Court then pointed out that when a case is submitted entirely upon stipulation, it is expected that the parties are agreed as to all material facts; that if they are in disagreement as to certain basic facts, they have not actually stipulated the facts, and that the burden of proof as to any facts in dispute lay upon the petitioner. The Court thereupon adjourned the hearing for three days to give the parties additional time to reach an agreement as to the facts or to enable the petitioner to produce what further proof it could. When the hearing resumed, the petitioner's counsel stated that he wished to submit the case on the basis of the existing stipulation, and that it constituted all the facts which the parties were *247 able to stipulate. No witnesses were called to testify as to any of the basic facts in dispute, or as to the ownership of stock in the various corporations during the critical period, or to explain any of the book entries. The Court "should not be asked to ferret out the correct answer to technical or difficult questions of law and fact from unexplained, uncoordinated evidence". Evergreen Cemetery Association, 25 B.T.A. 544. Unfortunately, we find the stipulation wholly inadequate to establish the facts which form the predicate for the petitioner's arguments. For the reasons stated, we hold that the respondent did not err in disallowing as invested capital, the item claimed under the designation "Cancellation of Indebtedness". Decision will be entered for the respondent. Footnotes
*. SEC. 718. EQUITY INVESTED CAPITAL. (a) Definition. - The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b) - (1) Money Paid In. - Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital; (2) Property Paid In. - Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. If the property was disposed of before such taxable year, such basis shall be determined in the same manner as if the property were still held at the beginning of such taxable year. If such unadjusted basis is a substituted basis it shall be adjusted, with respect to the period before the property was paid in, in the manner provided in section 113 (b) (2);↩